UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

QUINCY ROBERTSON,

          Petitioner,

     v.

JAMES WALKER, et al.,

          Respondents.

Case No.  10-cv-02633-PJH

**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; GRANTING CERTIFICATE OF APPEALABILITY**

      Before the court on reconsideration is the petition of Quincy Robertson, a state prisoner, for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  The court ordered supplemental briefing on Robertson's claim that his Sixth Amendment right to jury trial was violated when a jury convicted him of second degree felony murder without an express finding of malice.  The matter is submitted on the briefs.  For the reasons set forth below, the petition for writ of habeas corpus is DENIED.

**BACKGROUND**

**A.    Factual Summary**

      The following summary of the evidence presented at trial is taken from the published opinion of the California Supreme Court affirming the judgment.  The summary of evidence is not in dispute:

> During the evening of December 27, 1998, the victims Kehinde Riley and Ricky Harris, joined by Bradley Gentry and Lamont Benton, imbibed alcohol and used marijuana and cocaine while they went for a drive in Benton's automobile. At approximately 10:30 p.m., they stopped in front of defendant's residence on 99th Avenue Court in Oakland. Riley and Harris approached defendant's automobile, a Chevrolet Caprice

Classic, which was parked in front of defendant's residence. According to Benton's testimony at trial, while Gentry and Benton looked on, Riley and Harris began removing the vehicle's hubcaps, making loud noises in the process. They had removed the passenger side hubcaps and were turning to the driver side hubcaps when defendant emerged onto the porch of his residence.

According to statements subsequently made by defendant to the police, he had been watching television with his wife and children, heard a loud noise and, retrieving a firearm, went outside to investigate. Defendant denied any involvement in the shooting in his initial statement. After gunshot residue was discovered on his right hand, defendant claimed he had fired a weapon earlier in the day to demonstrate its operation for a prospective buyer. Following further interrogation, defendant explained that upon hearing a sound outside, he looked out and observed three or four men near his automobile, apparently engaged either in dismantling it or stealing it. Defendant recalled that the men looked at him in a threatening manner, and he was uncertain whether they would attempt to enter his residence. In his final statement to the police, defendant claimed that when he emerged from his residence, he held his gun at a 45–degree angle and fired two warning shots. The physical evidence, however, indicated that three shots had been fired. A bullet hole discovered in the windshield of defendant's automobile and two other bullet holes found two feet above ground level in a vehicle that was parked across the street tended to disprove defendant's claim that he had held the gun at a 45–degree angle.

Benton testified at trial that immediately following defendant's discharge of the weapon from the porch, Benton and Gentry drove away, while Riley and Harris attempted to flee on foot. Benton testified he heard from seven to nine additional gunshots as he drove away. Defendant, claiming he had heard a sound that resembled either a car backfire or the discharge of a firearm, admitted in his final statement to the police that he had walked at least as far as the sidewalk and possibly into the street before firing three shots at the fleeing men. He denied intending that the shots hit the men and claimed that he fired upwards into the air, intending, as he said, to "scare people away from my domain." He conceded that firing a weapon in a residential neighborhood was dangerous to human life, but said he had not been thinking clearly.

Riley's body was discovered approximately 50 yards from where gun casings indicated the firearm had been discharged. It appeared the shots had been fired by a person standing in the middle of the street in front of defendant's residence. Riley had been shot in the back of the head. Harris suffered a gunshot wound to the sole of his right foot.

On the night of the incident, one of defendant's neighbors heard shots and witnessed a person standing in a

2

"firing stance" in the street, firing shot after shot straight ahead and on each occasion correcting for the weapon's "kickback." The neighbor witnessed this person "swagger" back to the apartment complex where defendant resided.

One bullet casing was discovered on the porch of defendant's residence, two additional casings at the bottom of the stairs leading to defendant's apartment, and seven casings in the middle of the street in front of defendant's residence. Based upon the location of the bullet casings found in the street, the physical features of the surrounding neighborhood, and the location at which Riley and Harris were discovered after the shooting, the prosecution's ballistics expert testified that if the person who fired the weapon had held it at a 45–degree angle, he or she would not have struck the victims. This witness testified that in his opinion, the shooter must have pointed the weapon at the victims.

Character witnesses who testified in favor of defendant asserted that he was not a violent person, nor was he prone to anger. He enjoyed working on cars and was engaged in restoring his Chevrolet Caprice Classic for resale. Defendant's wife testified that during the time they resided on 99th Avenue Court, at least three of the family's vehicles had been broken into or vandalized.

Defendant's nephew recounted an episode in which defendant had been the victim of a shooting. The episode occurred six months prior to the charged crimes, following an automobile accident involving this nephew and the driver of another vehicle. After an argument erupted between the nephew and the other driver and while defendant was attempting to subdue his nephew, someone from the other vehicle fired on them, seriously injuring defendant's right arm. A clinical psychologist testified in defendant's behalf, expressing the opinion that defendant suffered from posttraumatic stress syndrome as a result of this and other incidents, that this condition caused defendant to be fearful and easily aroused emotionally, and that defendant likely had acted impulsively, without forethought, when he fired on the victims.

A ballistics expert testified on behalf of defendant, stating that persons lacking experience in shooting firearms tend to shoot in a manner that causes them to strike objects below their intended target.

In connection with the homicide charge, the jury was instructed on first degree murder, second degree murder, second degree murder with express malice, second degree murder with implied malice, second degree felony murder based on commission of the crime of discharging a firearm in a grossly negligent manner, and voluntary manslaughter. The defense argued that, at most, defendant might be liable for voluntary manslaughter on the theory that he acted in the heat of passion or from an honest but unreasonable belief in the need to defend himself.

3

> The jury deliberated for three days. At that point, a juror who complained of debilitating stress arising from asserted conflict among the deliberating jurors was excused. The juror was replaced by an alternate, and the jury deliberated for an additional three days prior to rendering its verdict.

*People v. Robertson*, 34 Cal. 4th 156, 161-63 (2004), *overruled on other grounds by*

*People v. Sarun Chun*, 45 Cal. 4th 1172 (2009).

## B.     Procedural History

Robertson was convicted following a jury trial in the Superior Court of Alameda County of the second degree murder of Kehinde Riley in violation of California Penal Code § 187, and assault of Rickey Harris with a deadly weapon and by means of force likely to inflict great bodily injury in violation of § 245(a)(1).  The jury found that Robertson personally used a firearm in the commission of these offenses (Cal. Pen. Code §§ 1203.06, 12022.5); that he intentionally discharged a firearm, proximately causing great bodily injury or death (§ 12022.53(d)); and that he inflicted great bodily injury (§ 12022.7(a)).  Robertson was sentenced to 40 years to life in prison, representing 15 years to life for the murder, plus 25 years to life for the firearm enhancement of the murder conviction, with a concurrent sentence of 8 years for the assault and related enhancements.

Robertson appealed his conviction, challenging the trial court's second degree felony-murder instruction based on his commission of the offense of grossly negligent discharge of a firearm (Pen. Code § 246.3).  In an opinion dated June 30, 2003, the California Court of Appeal affirmed the judgment upon determining that grossly negligent discharge of a firearm in violation of California Penal Code § 246.3 is an offense that merges with the resulting homicide and cannot serve as a predicate for second degree felony murder, but that the error in giving the felony murder instruction was harmless. Answer, Ex. 1 (*People v. Robertson*, 109 Cal. App. 4th 1740, 1 Cal. Rptr. 353 (2003), *superseded by People v. Robertson*, 34 Cal. 4th 156 (2004)).  The California Supreme Court subsequently affirmed Robertson's conviction in a published opinion issued August 19, 2004, which overruled the court of appeal's application of the merger doctrine to his

section 246.3 predicate offense.  The state supreme court held that under the collateral

purpose test, Robertson's asserted underlying purpose in discharging a firearm was to

frighten away the men who were burglarizing his car, rather than to injure or kill them.

*Robertson*, 34 Cal. 4th at 171.  Although the state supreme court disagreed with the court

of appeal's holding that the merger doctrine barred application of the felony-murder rule,

it noted that the court of appeal affirmed the conviction on the ground that any

instructional error was harmless, and affirmed the judgment.  *Id.* at 173.

On August 1, 2005, Robertson filed a federal petition for writ of habeas corpus

which asserted three claims: (1) that the trial court's denial of his motion to suppress his

confession violated his Fifth and Fourteenth Amendment rights because he had invoked

his right to counsel and because his confession was coerced; (2) that his Sixth

Amendment jury trial right was violated when a jury convicted him of second degree

felony murder without an express finding of malicious intent; and (3) that the California

Supreme Court's decision upholding his conviction constituted an unforeseeable and

retroactive judicial expansion of the second degree felony murder rule in violation of his

due process rights.  *See Robertson v. Runnals*, C 05-3103 PJH.  On January 3, 2008,

the court denied Robertson's petition.  On February 2, 2009, the Ninth Circuit issued a

memorandum disposition affirming the order denying habeas relief.  Answer, Ex. 7.

Mandate issued on April 1, 2009.

On March 30, 2009, the California Supreme Court issued a decision in *People v.*

*Chun*, expressly overruling its holding in *Robertson* that the merger doctrine did not bar a

second degree felony-murder instruction where the underlying felony was a violation of

section 246.3 and the purpose for discharging the firearm was independent of, or

collateral to, an intent to cause injury that would result in death.  45 Cal. 4th 1172, 1201

(2009).  The court in *Chun* held that when the underlying felony is assaultive in nature,

such as a violation of section 246.3, the felony merges with the homicide and cannot be

the basis of a felony-murder instruction.  *Id.* at 1200.  However, the state supreme court

held that, based on the evidence presented at Chun's trial, the error in instructing the jury

on felony murder was, by itself, harmless because any juror who relied on the felony-murder rule necessarily found that Chun willfully shot at an occupied vehicle, and therefore "no juror could find felony murder without also finding conscious-disregard-for-life malice." *Id.* at 1205. In *Chun*, the state supreme court overruled the lower appellate court's holding that the error in instructing on felony murder, standing alone, was prejudicial, and remanded for consideration whether the instructional error in combination with a separate evidentiary error, in allowing the jury to hear evidence that Chun admitted that he fired a gun, were prejudicial. *Id.* at 1205.

The state supreme court in *Chun* did not vacate Robertson's conviction or remand his case. Following issuance of the decision in *Chun*, Robertson filed a habeas petition in the California Supreme Court on May 8, 2009. On October 14, 2009, the state habeas petition was denied. Answer, Ex. 8.

On December 23, 2009, Robertson filed an application in the Ninth Circuit for leave to file a second or successive petition. On June 15, 2010, the court of appeals granted his application for authorization to file a second or successive petition. Answer, Ex. 9 (*Robertson v. Walker*, No. 09-74044 (9th Cir.)).

Robertson filed his second habeas petition in this court on June 16, 2010. By order entered April 13, 2012, the court dismissed the petition as a second and successive petition. Doc. no. 32. The court granted Robertson's request for a certificate of appealability, doc. no. 35, and Robertson appealed from the dismissal of his second habeas petition.

By memorandum disposition entered October 25, 2013, the Ninth Circuit vacated the order of dismissal and remanded the matter for consideration whether Robertson's case presents extraordinary circumstances that would warrant relief under Rule 60(b). *Robertson v. Walker*, No. 12-16067 (9th Cir.). The court of appeals held that the court erred in finding that Robertson's petition was second or successive, ordered the court to construe the second-in-time petition as a Rule 60(b)(6) motion for reconsideration of the denial of Robertson's original federal habeas petition, and held that the Rule 60(b)(6)

United States District Court
Northern District of California

1 motion was timely. By order entered September 12, 2014, the court granted Robertson's

2 motion for reconsideration of the claim that his Sixth Amendment right to jury trial was

3 violated when a jury convicted him of second degree felony murder without an express

4 finding of malice. The court ordered supplemental briefing on limited issues. The matter

5 is fully briefed and submitted on the papers.

**ISSUE PRESENTED**

7 Robertson seeks habeas relief on the ground that his Sixth Amendment jury trial

8 right was violated when a jury convicted him of second degree felony murder without an

9 express finding of malicious intent.

**STANDARD OF REVIEW**

11 A district court may not grant a petition challenging a state conviction or sentence

12 on the basis of a claim that was reviewed on the merits in state court unless the state

13 court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or

14 involved an unreasonable application of, clearly established Federal law, as determined

15 by the Supreme Court of the United States; or (2) resulted in a decision that was based

16 on an unreasonable determination of the facts in light of the evidence presented in the

17 State court proceeding." 28 U.S.C. § 2254(d). The first prong applies both to questions

18 of law and to mixed questions of law and fact, *Williams v. Taylor*, 529 U.S. 362, 407–09

19 (2000), while the second prong applies to decisions based on factual determinations,

20 *Miller-El v. Cockrell ("Miller-El I")*, 537 U.S. 322, 340 (2003).

21 A state court decision is "contrary to" Supreme Court authority, that is, falls under

22 the first clause of § 2254(d)(1), only if "the state court arrives at a conclusion opposite to

23 that reached by [the Supreme] Court on a question of law or if the state court decides a

24 case differently than [the Supreme] Court has on a set of materially indistinguishable

25 facts." *Williams*, 529 U.S. at 412-13. A state court decision is an "unreasonable

26 application of" Supreme Court authority, falling under the second clause of § 2254(d)(1),

27 if it correctly identifies the governing legal principle from the Supreme Court's decisions

28 but "unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413.

United States District Court
Northern District of California

The federal court on habeas review may not issue the writ "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly."  *Id.* at 411.  Rather, the application must be "objectively unreasonable" to support granting the writ.  *Id.* at 409.

A state court's determination that a claim lacks merit precludes federal habeas relief so long as "fairminded jurists could disagree" on the correctness of the state court's decision.  *Harrington v. Richter*, 131 S. Ct. 770, 786-87 (2011) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).  "[E]valuating whether a rule application [i]s unreasonable requires considering the rule's specificity.  The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations."  *Id.*  "As a condition for obtaining habeas corpus [relief] from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."  *Id.*

Under 28 U.S.C. § 2254(d)(2), a state court decision "based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding."  *Miller-El I*, 537 U.S. at 340.  Review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits.  *Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (2011).

**DISCUSSION**

**I.      Retroactive Application of *Chun***

Robertson claims that his Sixth Amendment jury trial right was violated when a jury convicted him of second degree felony murder without an express finding of malicious intent, based on the second degree felony murder instruction given at his trial which was erroneous under state law by retroactive application of *Chun.*

The parties agree that on present habeas review, the court looks to the state supreme court's summary denial of Robertson's second habeas petition, by order

United States District Court
Northern District of California

1  entered October 14, 2009.  Pet.'s Suppl. Br. (doc. no. 49) at 1 (citing *Harrington v.*

2  *Richter*, 131 S. Ct. 770 (2011)).  It is also undisputed that the state supreme court's

3  denial of habeas relief is presumed to have been adjudicated on the merits, in the

4  absence of some indication to the contrary.  *Id.* at 2.

5      In his second habeas petition to the state supreme court, Robertson sought

6  retroactive application of *Chun* to his case to overturn his conviction based on the error in

7  giving the second degree felony murder instruction.  The state supreme court summarily

8  denied the habeas petition and did not articulate whether the denial was based on (1) a

9  determination that *Chun* did not apply retroactively under state law, or (2) a determination

10 that *Chun* applied retroactively to Robertson's case, but that any instructional error was

11 harmless.  Robertson has not identified any alternative grounds for the state court to

12 deny his second habeas petition, other than these two possible grounds for denial.  The

13 court therefore proceeds to review both of these possible rulings by the state court.

14     If the state supreme court denied Robertson's habeas petition on the ground that

15 *Chun* did not apply retroactively to his conviction, which became final in August 2004, this

16 state court decision on non-retroactivity would not be contrary to, or involving an

17 unreasonable application of, clearly established federal law, as there is no clearly

18 established federal law that requires the state court to apply changes in the law

19 retroactively to a defendant whose judgment is final.  *See Moore v. Helling*, 763 F.3d

20 1011, 1021 (9th Cir. 2014) (reversing grant of federal habeas relief on claim of

21 instructional error based on change in Nevada law before conviction became final, where

22 state court judgment predated *Bunkley v. Florida*, 538 U.S. 835 (2003) (per curiam), in

23 which the Supreme Court directed the Florida Supreme Court to determine whether a

24 potentially exonerating change in state law had occurred before the defendant's

25 conviction became final, and held that the state court was required to apply that change

26 to the defendant's conviction if it found in the affirmative), *cert. denied*, 135 S. Ct. 2361

27 (2015).

28

United States District Court
Northern District of California

1    Robertson argues that *Chun* did not announce a change in the law, but only

2   clarified the law as it already existed and should be applied retroactively under the

3   principles set forth in *Bunkley*, as well as state appellate court decisions on retroactive

4   application of *Chun*.  Pet's Suppl. Br. (doc. no. 49) at 3-12 (citing, inter alia, *In re Hansen*,

5   227 Cal. App. 4th 906, 919 (2014), *review denied* (Oct. 1, 2014), and *In re Lucero*, 200

6   Cal. App. 4th 38, 46 (2011)).  As respondents point out, the California Supreme Court

7   has not addressed the issue whether *Chun* applies retroactively, and the state appellate

8   court decisions cited by Robertson held that *Chun* announced a new rule that applies

9   retroactively as a matter of state law.  Resp. Suppl. Br. (doc. no. 50) at 1-4.

10    Furthermore, in an unpublished opinion, the Ninth Circuit has recognized that

11   *Chun* announced a change in the law and affirmed denial of a federal habeas petition

12   filed by a state prisoner whose conviction was final when *Chun* was decided.  *Lozano v.*

13   *Diaz*, 586 Fed. Appx. 413, 414 (9th Cir. 2014), *cert. denied sub nom. Lozano v. Sherman*,

14   135 S. Ct. 1740 (2015).  "Although the California Supreme Court's decision in [*Chun*]

15   indicates that negligent discharge of a firearm merges with the killing so a charge under

16   § 246.3 cannot support felony murder, that decision came out after Petitioner's conviction

17   was final."  *Id.*  The Ninth Circuit in *Lozano* recognized that "[s]ubsequent changes in

18   state law cannot be grounds for federal habeas relief."  *Id.* (citing *Kleve v. Hill*, 243 F.3d

19   1149, 1151 (9th Cir. 2001) ("A change of law does not invalidate a conviction obtained

20   under an earlier law.")).

21    In light of this Ninth Circuit authority, the state court's decision that *Chun* did not

22   apply retroactively to Robertson's case was neither contrary to, nor an unreasonable

23   application of, clearly established federal law.

24    Alternatively, if the state supreme court determined that *Chun* applied retroactively

25   to Robertson's case, it would have denied Robertson's habeas petition on the ground that

26   any error in giving a felony murder instruction was harmless.  The court proceeds to

27   consider whether Robertson is entitled to habeas relief based on the state court's

28   harmless error determination.

United States District Court
Northern District of California

1   **II.    Harmless Error Analysis**

2          If the state court denied Robertson's habeas petition on the ground that the felony-

3   murder instruction omitted the element of malice by retroactive application of *Chun*, and

4   that the instructional error was harmless, this court must determine whether the state

5   court's harmless error determination was contrary to, or involved an unreasonable

6   application of, clearly established federal law.  28 U.S.C. § 2254(d)(1).  On federal

7   habeas review, the state must provide a "fair assurance" that the error was harmless

8   under *Brecht*.  *Morales v. Woodford*, 388 F.3d 1159, 1171 (9th Cir. 2004) (citing *Valerio*

9   *v. Crawford*, 306 F.3d 742, 761 (9th Cir. 2002) (en banc)).  Under *Brecht*, the harmless

10  error standard on federal habeas review of state court convictions is whether the error

11  "had substantial and injurious effect or influence in determining the jury's verdict."

12                 *Brecht v. Abrahamson* holds that where there is constitutional
13         error but the review is collateral rather than direct, we should
       not apply the "harmless beyond a reasonable doubt"
14         *Chapman* standard, and should instead apply the "less
       onerous" *Kotteakos* standard.   Accordingly, the critical
15         question is "whether, in light of the record as a whole," the
       error "had substantial and injurious effect or influence in
16         determining the jury's verdict."   On collateral review, *Brecht*
       holds that a federal court cannot grant the writ based merely
17         on a "reasonable possibility" that the constitutional error
       contributed to the verdict, but only where the petitioner "can
18         establish that it resulted in actual prejudice."

19  *Morales*, 388 F.3d at 1171 (citing *Brecht v. Abrahamson*, 507 U.S. 619, 638 (1993))

20  (footnotes omitted).  *Cf. Neder v. United States*, 527 U.S. 1 (1999) (applying *Chapman*

21  standard for harmless error on direct review of federal conviction).

22          Looking to the last reasoned state court decision on Robertson's claim, the state

23  supreme court issued a summary denial of Robertson's habeas petition that did not set

24  forth a reasoned analysis on the question whether the instructional error on the count of

25  second degree felony murder was harmless.  In the absence of a reasoned explanation

26  of the state supreme court's decision on Robertson's federal habeas claim, the court

27  conducts "an independent review of the record" to determine whether the state court's

28  decision was objectively unreasonable.  *Plascencia v. Alameida*, 467 F.3d 1190, 1198

1    (9th Cir. 2006); *Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003); *Delgado v.*

2    *Lewis*, 223 F.3d 976, 982 (9th Cir. 2000); *accord Lambert v. Blodgett*, 393 F.3d 943, 970

3    n.16 (9th Cir. 2004).

4          The court notes that on direct appeal, the court of appeal articulated its analysis

5    whether the instructional error caused prejudice, having held that a violation of section

6    246.3 merged with the resulting homicide, as the state supreme court would later hold in

7    *Chun*, and that it was error to instruct the jury that it could convict Robertson of second

8    degree felony murder by finding that he had violated section 246.3.  *See* Answer, Ex. 1,

9    *People v. Robertson*, No. A095055, slip op. at 25-29 (Cal. Ct. App., June 30, 2003),

10   *overruled by* 34 Cal. 4th 156.  The court of appeal determined that the erroneous

11   instruction on felony murder was harmless, reasoning as follows:

12                [U]nder the instructions given in this case, the jury must
           have concluded in convicting appellant of assaulting Harris
13         that appellant intended to harm Harris, in the sense that
           "intent" has traditionally been defined in the law, by intending
14         to use force on him or to do an act that was substantially
           certain to result in the application of such force.  In so
15         concluding, the jury must have rejected appellant's defense, to
           the charge of murder as well as assault that he was only
16         trying to frighten the victims when he fired the shots.  As to the
           murder charge, if the force appellant intended to apply against
17         Riley was lethal force, then he was guilty of murder with
           express malice (§ 188 [intent to kill]); if the force was intended
18         only to injure, then he was guilty of murder with implied
           malice; in either event, he was not guilty merely of grossly
19         negligent discharge of a firearm.  Thus, the murder conviction
           was necessarily based on a valid ground and the erroneous
20         instruction on felony murder was harmless.

21   *Id.* at 28-29 (citations omitted).  Because the court of appeal's decision was superseded

22   by the opinion of the California Supreme Court, 34 Cal. 4th 156, the holding of which was

23   subsequently overturned by *Chun*, 45 Cal. 4th at 1201, and the court of appeal's

24   reasoning was not adopted or substantially incorporated by the state supreme court, the

25   prejudice analysis by the court of appeal is not entitled to deference on present habeas

26   review under AEDPA.  *See Barker v. Fleming*, 423 F.3d 1085, 1093 (9th Cir. 2005).

27         Upon independent review of the record, the court finds that the evidence

28   presented at trial established the element of implied malice beyond a reasonable doubt to

*United States District Court*
*Northern District of California*

1   support a conviction for second degree murder and that the evidence did not support

2   either of the affirmative defenses asserted by Robertson.  Accordingly, the court

3   determines that the instructional error on the felony murder charge, presuming that *Chun*

4   applies retroactively to Robertson's case, did not have "substantial and injurious effect or

5   influence in determining the jury's verdict."  *California v. Roy*, 519 U.S. 2, 4-5 (1996) (per

6   curiam) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)).

7   **A.      Evidence of Malice**

8          At Robertson's trial, the jury was given the following instructions, among others, on

9   the charge of second degree murder of Kehinde Riley:

10         (1) second degree murder with express malice:

11                 Murder of the second degree is [also] the unlawful
12         killing of a human being with malice aforethought when the
           perpetrator intended unlawfully to kill a human being but the
13         evidence  is  insufficient  to  prove  deliberation  and
           premeditation.

14  CT 325.

15         (2) second degree murder with implied malice:

16                 Murder of the second degree is [also] the unlawful
           killing of a human being when:
17                 1. The killing resulted from an intentional act,
                   2. The natural consequences of the act are dangerous
18         to human life, and
                   3. The act was deliberately performed with knowledge
19         of the danger to, and with conscious disregard for, human life.
                   When the killing is the direct result of such an act, it is
20         not necessary to prove that the defendant intended that the
           act would result in the death of a human being.
21
    CT 326.
22
           (3) second degree felony murder predicated on the crime of grossly negligent
23
    discharge of a firearm in violation of Penal Code § 246.3:
24
                   The  unlawful  killing  of  a  human  being,  whether
25         intentional, unintentional or accidental, which occurs [during
           the commission or attempted commission of] [as the direct
26         causal result of] the crime of PC § 246.3 is murder of the
           second degree when the perpetrator had the specific intent to
27         commit that crime.

28

United States District Court
Northern District of California

1         The specific intent to commit PC § 246.3 and the commission or attempted commission of such crime must be proved beyond a reasonable doubt.

2

3    CT 327.

4         (4) first degree murder reduced to second degree by provocation:

5         If the evidence establishes that there was provocation which played a part in inducing an unlawful killing of a human being, but the provocation was not sufficient to reduce the homicide to manslaughter, you should consider the provocation for the bearing it may have on whether the defendant killed with or without deliberation and premeditation.

6

7

8

9    CT 343.

10        Robertson contends that omission of the element of malice in the felony murder

11   instruction was not harmless error because if the jury had been properly instructed that

12   they were required to find malice to convict Robertson of second degree murder, the jury

13   would have found him not guilty of murder.  Robertson argues that firing his gun into the

14   air as warning shots may have established the general intent to use or apply physical

15   force as required for an assault conviction, but that the intent required for assault does

16   not satisfy the malice required for second degree murder, particularly implied malice

17   which requires performing the intentional act with knowledge of the danger to, and with

18   conscious disregard for, human life.  Pet's Suppl. Br. (doc. no. 49) at 16-17.  The

19   evidence at trial, however, did not support Robertson's contention that he fired warning

20   shots into the air.  The only evidence to support this contention was Robertson's

21   recorded statement to investigators that he fired into the air, which was inconsistent with

22   other statements that he had made to police, first denying that he saw anything when he

23   went outside his apartment, then stating that he fired his gun to a prospective buyer but

24   failing to mention that he fired warning shots in order to scare off thieves.  In contrast to

25   this self-serving statement by Robertson, the prosecution presented credible evidence,

26   including eyewitness testimony and forensic evidence, that Robertson aimed at the

27   victims, to show an intentional act of firing at or in the direction of the victims to support,

28   at a minimum, a finding of implied malice.

United States District Court
Northern District of California

### 1.      Witnesses to the Shooting

An eyewitness saw Robertson firing his gun with his arm extended straight ahead, and not pointing in the air.  P. Brown, a neighbor living in an apartment complex on the same street as Robertson's home, testified that he saw the shooter standing in "a firing stance" and shooting his gun straight ahead, "aiming up the street," with "feet spread" and his arm extended straight out, "parallel to the ground," and not firing wildly up in the air, and then saw the shooter walk back to his apartment building with a swagger.  RT 488-492, 526-527, 529.

Another neighbor, S. Spears, testified to hearing rapid gunfire and then peeking out her window facing the court where she saw Robertson walking back to his house.  RT 469.

L. Benton and B. Gentry testified that they were drinking, smoking marijuana and using cocaine with the victims, Kehinde Riley and Ricky Harris, before Benton drove them to 99th Avenue Court where the victims took the hubcaps off Robertson's Caprice Classic.  The victims started taking the hubcaps off the Caprice Classic, and Riley put two hubcaps in the back of Benton's car, then walked back to the Caprice Classic to get the other two hubcaps.  RT 398.  Benton was sitting in his car and Gentry was standing outside Benton's car when they heard gunshots.  Both Benton and Gentry testified that they did not hear anyone yell "Hey" or "Get away from my car!" before the shots were fired.  RT 367-368, 402, 434.

Gentry also testified that he saw the shooter point the gun "in our direction" and shoot, with his arm out parallel to the ground.  RT 404, 412.  The victims ran past Gentry, who jumped into Benton's car which then drove off while the shooter was still shooting. Gentry could hear bullets coming at them, and could see the flash from the muzzle of the gun as it fired.  RT 412.  Gentry saw that Riley was running towards the car then "spun around the back end of the car and then that was it."  RT 412-413.

United States District Court
Northern District of California

### 2.    Forensic Evidence

The forensic evidence showed that the gun was pointed at the victims, not fired into the air.  The coroner testified that victim Kehinde Riley had a gunshot wound to the right back side of the head, about one inch off the midline of the back of the head.  RT 164-165.  The bullet passed through part of the brain, and was going in the direction "towards the front of the body, going very slightly towards the top of the head at a five-degree angle, and it did not deviate either to the right or left sides."  RT 171.

Ricky Harris suffered a gunshot to his foot, and required surgery to remove the bullet.  RT 277-278.  Officer Doolittle tracked down Harris at the San Leandro Hospital where he showed up with a gunshot wound to the bottom of his right foot.  RT 788.  Officer Doolittle retrieved Harris's shoes, which had a bullet hole in the foot bed of the right shoe, with material pushed up from the base of the shoe into the interior of the shoe.  RT 795.

The police recovered three 9-mm casings in the porch area in front of Robertson's apartment, and seven 9-mm casings on the street, in the center of the court.  RT 611, 681-692.  The ballistics expert opined that the 10 casings found at the scene were fired by the same Lorcin 9-mm gun.  RT 847.  He also opined that the bullets taken from Harris's foot and Riley's head were fired in a 9-mm luger caliber pistol, and most likely a Lorcin.  RT 862.  No firearm was recovered at the scene or from Robertson, so the expert was not able to testify about the accuracy of the firearm.  RT 888.

The prosecution's firearms expert, Sgt. Tolleson, opined that based on the location of the bullets lodged in Robertson's car, where the bullet went through the windshield, hit the dash and bounced up and traveled along the ceiling, and the side of a trailer parked outside Robertson's home, if someone stood on the porch area of Robertson's apartment complex and fired a 9mm Lorcin, it was not possible that the shooter was pointing the gun up at a 45-degree angle into the air.  RT 675, 908-909.  The firearms expert explained that if the gun were fired at a 45-degree angle, the bullet could travel up to half a mile or even a mile away, but would not end up in the car or trailer where the bullets

16

were recovered.  RT 909, 922.  Similarly, based on the strike marks found on a nearby wash house, the firearms expert opined that the gun would have to be pointing in the area of the wash house, not at a 45-degree angle.  RT 909-910.

Sgt. Tolleson also opined that if a person running down 99th Avenue Court were shot in the bottom of his foot, the shooter standing in front of the apartment complex would have been pointing the gun at the running person, because "even if one of the rounds skipped off the ground down there, if I'm shooting down there I have to be pointing this gun at that person.  I'm not pointing it somewhere else in the air."  RT 911. Finally, the firearms expert opined that if a person running away down 99th Avenue Court is shot in the rear of his head, the shooter firing the gun from the front of the apartment complex would have pointed the gun in the direction of the running person, and that it is not possible that the gun was pointed at a 45-degree angle up in the air because the bullet would have climbed about several hundred feet above the runner's head.  RT 911-912.

Notably, the defense firearms expert, Mr. Rellar, conceded that if someone was standing at the stoop in front of Robertson's apartment and fired a gun hitting a person in the head, "it would have had to have been pointed where the bullet struck when again when it detonated.  I don't know how it got to that position or did it come down, but it had to have been pointed there in order for it to strike there."  RT 1302.

### 3.    Robertson's Statements

Robertson did not testify but his statements to the police and investigators were introduced at trial, including recorded interviews that were played for the jury.  RT 577, 634.  Robertson was detained at the scene of the shooting, where he told Officer Sena that he was in the bedroom when he heard someone messing with his car, went outside to check on his car when he heard some gunshots but did not see anything, went back inside his residence and shortly later, came back outside, where the police first contacted him.  RT 533.  Robertson signed a written statement prepared by Officer Sena.  RT 535.

United States District Court
Northern District of California

1    Later, while Robertson was detained in a police car, Sergeant Brock talked to him.

2  Robertson mentioned coming outside because he heard something or heard gunshots.

3  RT 547.  Sgt. Brock asked Robertson if he would let the police take a gunshot residue

4  test of his hands which would eliminate him as a possible suspect.  RT 547.  Robertson

5  then told Sgt. Brock, "I shot a gun earlier tonight," and indicated that he had sold a gun

6  earlier that day so he could buy a windshield for his car and that he fired a couple rounds

7  to demonstrate it was in working condition.  RT 548.  Robertson did not tell the police at

8  that point that the gun accidentally discharged.  RT 548.

9    The next day, the police conducted a formal interview of Robertson at the

10  homicide room of the police station, where Robertson told Sgt. Brock that the night of the

11  shooting, he was in his bedroom when he heard noise sounding like somebody was

12  dismantling his car.  "At that point, he got up from the bed, grabbed his gun and went to

13  the front door of his apartment which is on the porch area, and he fired . . . five rounds

14  . . . from what he said."  RT 564-565.  Robertson said there were a couple of people by

15  his car and that they scattered when he fired his gun.  RT 565.  In his taped statement to

16  Sgt. Brock, as summarized by defense counsel,[1] Robertson said "I heard something like

17  a backfire or a gunshot.  I'm not for sure."  RT 1415.  Then he said, "That's when they

18  were driving away."  RT 1415-1416.  Robertson also said, "They looked, they looked at

19  me kind of like they was gonna do something.  Then that's when I shot in the air. . . . My

20  heart was beating too fast.  I didn't know what they were gonna do."  RT 1416.

21    Robertson then gave a taped interview with an investigator for the District

22  Attorney's office, Inspector Landini, and a deputy D.A. when he stated, "I don't know, I

23

24  [1]    Robertson refers the court to a transcript of his post-arrest statement that is not in
   the record.  See Pet. Suppl. Br. (doc. no. 49) at 13-14.  The trial court provided the jury
25  with a transcript of Robertson's taped interviews while the tape was played in court, but
   specifically instructed the jury, "remember that the actual evidence is the spoken word,
26  not the transcript.  They are solely an aid to your listening to this."  RT 576.  See also RT
   635.  The parties stipulated that "the court reporter does not have to report the taped
27  statement," and the record does not reflect that the transcripts, People's Exhibits 37A and
   45A, were admitted into evidence.  CT 203, 205, 259.  The record reflects only that the
28  cassette tapes themselves, People's Exhibits 37 and 45, were admitted into evidence.
   CT 259, 264.

can't really say because all I saw is somebody looking at me like they was gonna come back and try and do something to me. . . . The only thing I heard at the time was like a backfire or a shot.  The two warning shots, they was a warning.  The three shots, I actually heard something that sounded like a backfire." RT 1416.  He also said, "All I saw was people down by my car.  I don't know what they was doing or what they was carrying.  All I know, when they took off there was like a backfire or a shot.  That's all I know.  I asked Detective Brock did they find any shells, but he didn't give me no response."  RT 1416.

### 4.    Closing Arguments

In closing, the prosecutor argued primarily that "[m]alice is present, is pervasive in this case.  It permeates it.  The defendant's actions clearly demonstrate malice.  This case is about murder."  RT 1395-1396.  In the alternative, the prosecutor argued "[e]ven if you actually believe that the defendant had an honest belief that he was -- his life was threatened right then and there when he shot that gun, even if you believe that you don't get around recklessly discharging that firearm and killing somebody.  You still get felony murder.  When he recklessly discharged that gun as they were running away from him, Kehinde Riley died, you still get second degree murder.  There's no way around this fourth theory.  There really isn't.  Implied malice, express malice, first degree knocked down to a second and felony murder rule.  It is -- this case is a murder."  RT 1396.

In rebuttal, the prosecution argued as follows:

> You cannot get around that this case is not second degree because it clearly is.  Like I said, there are four ways to get there.  If you believe the evidence presented to you by the prosecution you have express malice.  There is no doubt about it.  If you believe the evidence presented to you by the prosecution you have first degree murder with a slight provocation.  If you don't believe any of the evidence that was put forth in this trial and you only -- by the prosecution, you only believe the defense, you have implied malice.  If you only believe the defense evidence and disregard all that other evidence you still got felony murder in the second degree.

RT 1449.

United States District Court
Northern District of California

The record reflects that the prosecution focused its presentation of evidence and argument on proving malice, and did not rely solely on the felony murder rule to prove only grossly negligent discharge of a firearm to secure a second degree murder conviction.  Here, the evidence showed not mere recklessness to support gross negligence, but an intentional act of aiming and shooting in Riley and Harris's direction to support a finding of implied malice, if not express malice.  The court limits its analysis to the implied malice theory of second degree murder, on which respondents focus their argument addressing whether the instructional error had a substantial and injurious effect or influence in determining the jury's verdict.  Resp. Suppl. Br. (doc. no. 50) at 8-9.

The jury was instructed on implied malice as follows:

> Malice is implied when:
>
> 1.  The killing resulted from an intentional act,
>
> 2.  The natural consequences of the act are dangerous to human life, and
>
> 3.  The act was deliberately performed with knowledge of the danger to, and with conscious disregard for, human life.

CT 323; RT 1345.

The evidence of implied malice presented at trial was overwhelming.  Prosecution witnesses P. Brown and B. Gentry both testified that they saw Robertson shooting his gun with his arm straight out, not pointed up in the air to fire warning shots as Robertson told investigators.  Both the prosecution and defense firearms experts opined that Robertson's gun was pointed in the direction of the victims when they were shot, and the prosecution expert opined that the victims could not have been hit by bullets that were aimed upward at an angle.  The prosecution expert's opinion that the bullets were aimed in the victims' direction, and not angled up in the air, was consistent with the defense theory that one of the bullets may have ricocheted to hit Harris in the foot.  The direction of the bullets that were lodged in Robertson's car and a camper trailer, and strike marks found on the wall of a wash house, also contradicted the defense argument that Robertson fired up in the air.

20

The evidence was consistent with the motive proffered by the prosecution: that when Robertson found the victims dismantling his car, he shot at them out of anger, not out of fear for his life.  The prosecutor pointed out that if Robertson had been scared for his safety, he would not have walked another 50 feet into the court after the victims ran away and fired seven more shots, rather than run back inside the house.  RT 1393-1394. The forensic evidence established that Robertson, who admitted to firing a few shots, fired 10 casings that were found at the scene, and that the casings were consistent with being fired by the same type of 9-mm pistol as four bullets that were recovered from the scene, including bullets recovered from each of the victims.  The location of the casings were consistent with the prosecution's theory that Robertson heard noises, went outside to check on his car, saw some people at his car and pointed his gun at them, firing three bullets, one of which was fired into his car, then walked about 50 feet toward the center of the court and fired another seven shots at them.  RT 1441.  Although it could not be proven that the casings and bullets were fired from the same firearm, there was no evidence of other bullets or casings at the scene to support the defense theory that the victims may have fired weapons first.  RT 1417-1418.

Although the defense argued that Robertson was inexperienced with firearms and that when he thought he was firing warning shots up in the air, the shots were lower than he expected, RT 1433-1435, the eyewitness testimony and physical evidence established that Robertson aimed in the direction of the victims as they ran away from his car.  The evidence presented at trial supported the required elements for implied malice: that Riley's death resulted from Robertson aiming and firing his gun at Riley and Harris; the natural consequences of firing a gun at or near someone are danger to human life; and Robertson deliberately shot his gun with knowledge of the danger, and with conscious disregard for, human life.

The superseded opinion of the court of appeal, though not entitled to deference here, is persuasive on the issue whether the jury found implied malice despite the erroneous felony-murder instruction.  In concluding that the felony-murder instructional

error was harmless, the court of appeal reasoned that the jury's finding of intent to injure to support the conviction for assault on Harris indicates that the jury found that Robertson intended to use force on Harris by shooting in his direction and rejected the defense theory that he was only trying to scare off the victims by firing warning shots.  Answer, Ex. 1 (slip op.) at 28-29.  In the instruction on the assault charge, the jury was instructed that it must find (1) a person was assaulted; and (2) the assault was committed with a deadly weapon or instrument or by means of force likely to produce great bodily injury. CT 347.  Thus, even if the jury believed that Robertson intended to apply force intended only to injure the victims, and did not intend to use lethal force, that finding is sufficient to satisfy the implied malice requirement for second degree murder.  *See* Answer, Ex. 1 (slip op.) at 28-29.  In light of the record, the state court's finding of malice was not an unreasonable determination of the facts.

**B.    Affirmative Defenses**

Robertson contends that the erroneous felony-murder instruction caused actual prejudice because the jury was not required to find the element of malice and therefore did not reach his affirmative defenses of imperfect self-defense and heat of passion which would negate malice.  Robertson argues generally that evidence sufficient to establish intent to support the assault conviction does not necessarily establish the malice required to support the second degree murder conviction because he asserted affirmative defenses that would negate malice on the second degree murder count that could not be asserted as defenses to the assault count.  However, Robertson fails to address the weight of the evidence of malice that was presented at trial and the lack of evidence to support either of his affirmative defenses.

**1.    Defense Evidence**

At trial, Robertson presented evidence that he recently had been the victim of violent crime, including carjacking and being shot in the shoulder following a minor traffic accident in March 1998.  RT 984-986, 1157.  In his post-arrest statement to the deputy district attorney and investigator, Robertson stated that he fired his gun in the air in order

to scare away the men who were burglarizing his car.  In his taped statement to the police, Robertson stated that he fired his gun after the burglars looked at him as if they were going to do something.  RT 1416.

Robertson called an expert in clinical psychology and psychological testing, Dr. Kaufman, who testified that in his opinion, Robertson suffered from post-traumatic stress disorder after being shot in March 1998, prior to the December 1998 shooting of Riley and Harris.  RT 1159-60, 1272.  Dr. Kaufman opined that some of Robertson's symptoms were that he "wasn't going out, he was more reclusive, he was edgy, he was fearful, he was kind of haunted by nightmares and fears for his own safety or images of his own death, and it put him on edge."  RT 1191.  Dr. Kaufman also suggested that Robertson "was probably hyperreactive, what we call this startle response.  What was that? What was that?  And sometimes . . . people who experience PTSD[,] if then they are in another situation they perceive to be life threatening they can become extremely reactive, do things that are very much out of character and sometimes do things without their complete conscious awareness."  RT 1191.  In Dr. Kaufman's opinion, Robertson's condition would have "likely caused him to act impulsively, perhaps without much forethought, and out of a position of intense fear," to hearing noise that he perceived to be a threat to him and his family.  RT 1059.

Robertson did not testify at trial.  The defense called several character witnesses to testify about Robertson's nonviolent nature.  None of the defense witnesses refuted the eyewitness testimony that Robertson fired straight ahead in the direction of the victims and did not fire randomly up in the air.

### 2.    Jury Instructions

The jury was instructed on the affirmative defenses of (1) actual but unreasonable belief in the need for self-defense, and (2) heat of passion, as follows:

> [1] ACTUAL BUT UNREASONABLE BELIEF IN
> NECESSITY TO DEFEND -- MANSLAUGHTER
>
> A person, who kills another person in the actual but
> unreasonable belief in the necessity to defend against

imminent peril to life or great bodily injury, kills unlawfully, but does not harbor malice aforethought and is not guilty of murder.  This would be so even though a reasonable person in the same situation seeing and knowing the same facts would not have had the same belief.  Such an actual but unreasonable belief is not a defense to the crime of voluntary manslaughter.

As used in this instruction, an "imminent" peril or danger means one that is apparent, present, immediate and must be instantly dealt with, or must so appear at the time to the slayer. . . .

[2] SUDDEN QUARREL OR HEAT OF PASSION AND PROVOCATION EXPAINED

To reduce an <u>unlawful killing</u> from murder to manslaughter upon the ground of sudden quarrel or heat of passion, the provocation must be of the character and degree as naturally would excite and arouse the passion, and the assailant must act under the influence of that sudden quarrel or heat of passion.

The heat of passion which will reduce a homicide to manslaughter must be such a passion as naturally would be aroused in the mind of an ordinarily reasonable person in the same circumstances.  A defendant is not permitted to set up his own standard of conduct and to justify or excuse himself because his passions were aroused unless the circumstances in which the defendant was placed and the facts that confronted him were such as also would have aroused the passion of the ordinarily reasonable person faced with the same situation.  Legally adequate provocation may occur in a short, or over a considerable, period of time.

The question to be answered is whether or not, at the time of the killing, the reason of the accused was obscured or disturbed by passion to such an extent as would cause the ordinarily reasonable person of average disposition to act rashly and without deliberation and reflection, and from passion rather than from judgment.

CT 333, 334.  *See also* CT 335-338.

### 3.    Defense Argument

In closing, defense counsel did not deny that Robertson fired the bullet that killed Riley, but focused on evidence about his state of mind and the affirmative defenses that would negate malice:

This is voluntary manslaughter.  And there are two ways to get there: heat of passion, or 2, unreasonable belief for self-defense.

United States District Court
Northern District of California

Let's look at the facts we have here.  You've got an instruction which is going to say to you when you are considering heat of passion the question is at the time of the killing was the reason of the accused obscured or disturbed by passion to such an extent as would cause an ordinarily reasonable person to act rashly, without deliberation and reflection from passion rather than judgment?

And the instructions go on further to say that there's no specific emotion which constitutes heat of passion, not fear, not revenge.  Any emotion may be involved in heat of passion that causes judgment to give way to impulse and rashness.

That's why we've talked about post-traumatic stress disorder here.  Post-traumatic stress disorder, when somebody suffers from that and suffers under that -- I'm going to talk about that more in a minute -- they may experience extreme anxiety or even panic upon exposure to circumstances that either literally or symbolically remind them of the traumatic circumstances which initially caused the condition.  That was the shooting.
. . .

Now the other way to get to voluntary manslaughter is an actual but unreasonable belief in the necessity to defend oneself against imminent peril to life or possibility of great bodily injury.  And that's another possibility here.  You know from the statements that Quincy made -- and you will have the opportunity to listen to those again if you choose -- what Quincy said to Sergeant Brock was "I heard something like a backfire or a gunshot.  I'm not for sure."  What he says also to Brock, "That's when they were driving away."  He also says to Brock "They looked, they looked at me kind of like they were gonna do something.  Then that's when I shot in the air."  And again he said "They looked at me sort of funny."  And he also said to Sergeant Brock "I was -- my heart was beating too fast.  I didn't know what they were gonna do."

Unreasonable?  They were far away from him.  Was he panicked, was he scared?  Yes, he was.  When he gave the statement to Lou Landini and Joanie Leventis he said "I don't know, I can't really say because all I saw is somebody looking at me like they was gonna come back and try to do something to me." . . .

When he first went out there here was a guy was pumping -- that's how he describes himself -- he was jacked up, his heart was beating fast, he was scared.  He thought, he thought and he said that -- and you can read it again in his statement -- that they were coming in the side window.  He ran to his front door, he looked out and the first place he looked was right at that bedroom window which you know as you look out is on the left-hand side of the door.  And he looked over there because that's where he thought they were.

Now, at the time he gets out there he's nervous and scared and probably misperceiving and he sees these guys,

1  
2  
3  
4  
5  
6  
7  
8  

> he tells you that, he didn't know what they were doing by his car but they look over at him and he thinks that maybe they're gonna run up on him.  Maybe this is not even a rational belief but that's what he thought.  He thought they were gonna come over and try and do something to him.  And given his past experiences, this is not an unreasonable thought for him to have.  He's terrified out there and so he fires a shot at them.  Then he goes down the walkway after he sees -- he says [sic] them going, he says [sic] them scattering, he goes down the walkway and as the car is pulling out that's when he hears a backfire.  And that's when he fires the rest of the shots.  He thinks they're shooting at him.  He believed that it was either a backfire or a shot and he believed it was a shot enough -- I mean you can say well, he made that up.  But then he asked Sergeant Brock did you find any other casings?  Did you find any other bullets?  Do you know if they were shooting at me?

9  RT 1413-1417.

10  **4.    Heat of Passion**

11  To establish the heat of passion affirmative defense, Robertson's attorney argued

12  that after experiencing the life-threatening event of being shot, Robertson was easily

13  agitated due to his PTSD, and that he got into a panic and distress when he heard

14  sounds and thought someone was coming into his house and thought he was being shot

15  at as the perpetrators' car was driving away.  RT 1413, 1418-24.  However, the

16  prosecutor emphasized that the heat of passion defense had to be decided under a

17  reasonable person standard.  RT 1387-1389, 1400.  Based on Robertson's statements in

18  the record, that he heard noises and thought someone was trying to come into the side

19  window, and after looking out the front door to see if anyone was going into the house,

20  that he went outside and saw people next to his car, and that they looked at him "sort of

21  funny," it was not unreasonable for the state court to find that under the circumstances,

22  an ordinarily reasonable person would not be provoked to act rashly, and without

23  deliberation and reflection, and to reject the heat of passion defense.

24  **5.    Actual But Unreasonable Belief in Need for Self-Defense**

25  The prosecutor conceded that PTSD could contribute to whether Robertson had

26  an honest belief in the need for self-defense.  RT 1400.  However, although defense

27  counsel argued that Robertson felt scared, there was no evidence presented at trial that

28  Robertson stated that he felt that his life or safety was threatened when he went outside

United States District Court  
Northern District of California

United States District Court
Northern District of California

to check on his car.  Robertson indicated that when he thought someone was coming in the side window, he ran to his front door and looked at the bedroom window because that's where he thought they were.  RT 1416-1417.  Then, after checking to see if anyone was breaking into the house, Robertson indicated that he went outside to check on his car, then seeing people near his car and that "they look at me sort of funny."  In closing, defense counsel argued that "he thought they were gonna come over and try and do something to him," and "based on the weird looks that the guys were giving him and the sound of the backfire, that he needed to protect himself and he needed to protect his family and he fired those shots."  RT 1417-1418.  The evidence, however, did not show that Robertson was actually scared or feared for his safety when he went outside, after he looked out the front door to make sure no one was coming into the side window.

Robertson's statement, as summarized by defense counsel, indicates that he initially thought someone was trying to break into his house when he heard noises outside from his bedroom, but the record does not reflect that Robertson indicated that he continued to think that someone was coming into his house after he went outside to check on his car.  RT 1416-1417.  As the prosecutor argued in closing, Robertson did not tell the police or the investigator that he was scared for his life, or that he thought that the people dismantling his car were coming at him.  RT 1392-1393.  Rather, in the taped interview, as summarized by the attorneys, Robertson described going outside and seeing people dismantling his car, then seeing someone look up at him, and firing his gun.  RT 1391, 1416.  As the prosecutor noted, Robertson described seeing people crouched down by the tires on the driver's side of his car, and one person standing on the passenger side, suggesting that he understood that they were taking his hubcaps.  RT 1392.  Robertson stated that he was just scaring away the victims who were dismantling his car, but even after the victims ran away, the evidence showed that Robertson walked into the middle of the street and fired more rounds.  RT 1394-1396.  The evidence supported the prosecutor's argument that Robertson's intent was not to protect himself,

1   and that he did not honestly believe that he was in fear for his life or great bodily injury,

2   but that he was "angry because these guys were messing with his car." RT 1395.

3          It was not unreasonable for the state court to find that Robertson's statements that

4   he fired warning shots in the air meant to scare off the victims, which were inconsistent

5   with previous statements that he made to police denying that he saw anything and failing

6   to mention that he shot at the victims or that he feared for his safety, were not credible, in

7   light of the eyewitness testimony that Robertson shot in the victims' direction in a firing

8   stance with his arm parallel to the ground, which was consistent with the forensic

9   evidence.

10         **C.     Harmless Error**

11         In light of the evidence, the state court's findings of an intentional act for implied

12  malice to support second degree murder, and the findings on the affirmative defenses

13  that there was inadequate provocation to support a heat of passion defense, and that

14  Robertson did not have an actual but unreasonable belief in the necessity to defend

15  himself or his family, were not an unreasonable determination of the facts. In light of the

16  overwhelming evidence in the record of Robertson's intentional act of aiming and firing

17  his gun at the victims, Robertson has failed to show that the felony murder instruction had

18  a substantial and injurious effect or influence on the verdict. Accordingly, the state

19  court's denial of Robertson's Sixth Amendment claim was neither contrary to, nor an

20  unreasonable application of, clearly established law.

21                                    **CONCLUSION**

22         For the reasons set forth above, the petition for a writ of habeas corpus is

23  DENIED. This order fully adjudicates the petition and terminates all pending motions.

24  The clerk shall close the file.

25                          **CERTIFICATE OF APPEALABILITY**

26         To obtain a certificate of appealability, Robertson must make "a substantial

27  showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "Where a district

28  court has rejected the constitutional claims on the merits, the showing required to satisfy

§ 2253(c) is straightforward.  "The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  Section 2253(c)(3) requires a court granting a COA to indicate which issues satisfy the COA standard.  Here, the court finds that the following claim presented by Robertson in his petition meets that standard: whether his Sixth Amendment right to jury trial was violated when a jury convicted him of second degree felony murder without an express finding of malice based on instructional error.  Accordingly, the court GRANTS the COA as to that issue.  *See generally Miller-El*, 537 U.S. at 335-38.

**IT IS SO ORDERED.**

Dated: January 15, 2016

_____
PHYLLIS J. HAMILTON
United States District Judge